UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMIGRANT BANK, f/k/a EMIGRANT
SAVINGS BANK,

                              Plaintiff.

          -v-

COMMONWEALTH LAND TITLE
INSURANCE COMPANY,

                              Defendant.

No. 15-CV-7593 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Lee S. Wiederkehr, Esq.
Michael J. Schwarz, Esq.
DelBello Donnellan Weingarten Wise & Wiederkehr, LLP
White Plains, NY
*Counsel for Plaintiff*

Michael R. O'Donnell, Esq.
Bethany A. Abele, Esq.
Riker, Danzig, Scherer, Hyland & Perretti LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Plaintiff Emigrant Bank, f/k/a Emigrant Savings Bank ("Emigrant" or "Plaintiff"), brings this Action against Commonwealth Land Title Insurance Company ("Commonwealth" or "Defendant"), for breach of contract in relation to a title insurance policy (the "Policy") issued by Commonwealth. (*See* Notice of Removal Ex. 1 at 7–14 ("Compl.") (Dkt. No. 1).) Before the Court are the Parties' Cross-Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (*See* Dkt. Nos. 59, 66.) For the reasons to follow, both Motions are denied.

<u>I. Background</u>

<u>A. Factual Background</u>

<u>1. The Loans and Mortgages</u>

In 2005 and 2006, Eugene Boleslawski ("Boleslawski") gave three loans to John and Ann Quattrocchi (the "Quattrocchis") and their business, Rock Point Builders, LLC. (*See* Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Def.'s 56.1") ¶ 1 (Dkt. No. 68); Pl.'s Resp. to the Rule 56.1 Statement of Material Facts of Def. ("Pl.'s 56.1 Resp.") ¶ 1 (Dkt. No. 75).) Boleslawski gave a $383,000 and a $500,000 loan to Rock Point Builders, LLC, each of which was secured by a mortgage on 5 Perrins Peak Road, Stony Point, New York (the "Subject Property"), and a $366,000 loan to the Quattrocchis, secured by a mortgage on 98 Buckberg Road, Tomkins Cove, New York. (*See* Def.'s 56.1 ¶ 1; Pl.'s 56.1 Resp. ¶ 1.)[1] In June 2007, the Quattrocchis submitted an application to Emigrant, (*see* Def.'s 56.1 ¶ 4; Pl.'s 56.1 Resp. ¶ 4), and on August 6, 2007, the Quattrocchis received a $750,000 loan from Emigrant Mortgage Company, Inc. ("EMC"), (*see* Pl.'s Local Rule 56.1 Statement of Material Facts Not in Dispute ("Pl.'s 56.1") ¶ 1 (Dkt. No. 65); Def.'s Resp. to Pl.'s Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Def.'s 56.1 Resp.") ¶ 1 (Dkt. No. 78)). The loan was secured by a mortgage on the Subject Property, and the sum was disbursed to Boleslawski in the amount of $724,942.11. (*See* Pl.'s 56.1 ¶¶ 2–3; Def.'s 56.1 Resp. ¶¶ 2–3.) On August 6, 2007, EMC assigned the mortgage to Plaintiff (the "Emigrant Mortgage"). (*See* Pl.'s 56.1 ¶¶ 9–10; Def.'s 56.1 Resp. ¶¶ 9–10.) The Quattrocchis' application to Emigrant stated that the Quattrocchis

---

[1] Ned Kopald, Esq. served as Boleslawski's attorney in connection with the loans. (*See* Def.'s 56.1 ¶ 2; Pl.'s 56.1 Resp. ¶ 2.) James Contacessa, an employee of Discount Funding, served as the Quattrocchis' mortgage broker. (*See* Def.'s 56.1 ¶ 4; Pl.'s 56.1 Resp. ¶ 4.)

owed $800,000 on the Subject Property, but did not disclose the mortgage on the property at 98 Buckberg Road.  (*See* Def.'s 56.1 ¶ 5; Pl.'s 56.1 Resp. ¶ 5.)

On August 3, 2007, "three . . . days before the closing on the Emigrant loan, and unbeknownst to Emigrant, the Quattrocchi[]s obtained a loan from IndyMac Bank, F.S.B. ("IndyMac") in the amount of $535,000.00" (the "IndyMac Mortgage").  (Pl.'s 56.1 ¶ 11; Def.'s 56.1 Resp. ¶ 11; Def.'s 56.1 ¶ 10; Pl.'s 56.1 Resp. ¶ 10.)  The application to IndyMac stated that the Quattrocchis owed $500,000 on the Subject Property, but failed to disclose the Emigrant Mortgage.  (*See* Def.'s 56.1 ¶ 6; Pl.'s 56.1 Resp. ¶ 6.)

On August 27, 2007, Perfect Abstract, Inc. recorded the IndyMac Mortgage.  (*See* Pl.'s 56.1 ¶ 21; Def.'s 56.1 Resp. ¶ 21.)  The Emigrant Mortgage was not recorded until June 17, 2008.  (*See* Pl.'s 56.1 ¶ 22; Def.'s 56.1 Resp. ¶ 22.)[2]

### 2.  The Policy

Commonwealth issued the Policy to "EMC, its successors and/or assigns" in connection with the transaction through its title policy issuing agent, Cypress Title.  (Pl.'s 56.1 ¶ 4; Def.'s 56.1 Resp. ¶ 4; Def.'s 56.1 ¶ 14; Pl.'s 56.1 Resp. ¶ 14.)  The Policy, dated August 6, 2007, insured a first mortgage lien against the Subject Property.  (*See* Pl.'s 56.1 ¶¶ 6, 8; Def.'s 56.1 Resp. ¶¶ 6, 8.)  The Policy

> insures as of [the] [d]ate of Policy . . . against loss or damage . . . sustained or incurred by [Emigrant] by reason of . . .
>
> 10.  The lack of priority of the lien of the [Emigrant] Mortgage upon the Title over any other lien or encumbrance. . . .
>
> 14.  Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 13 that has been created or attached or has

---

[2] Plaintiff asserts that the delay in recording occurred because "the instrument apparently sat misplaced and unrecorded[] in the office of Commonwealth's title agent[] for almost a year." (Pl. Emigrant Bank's Mem. of Law in Supp. of Their [sic] Mot. for Summ. J. 1 (Dkt. No. 63).)

been filed or recorded in the Public Records subsequent to [the] [d]ate of Policy and prior to the recording of the [Emigrant] Mortgage in the Public Records.

(Decl. of Michael R. O'Donnell, Esq. in Supp. of Def.'s Mot. for Summ. J. ("O'Donnell Decl.") Ex. 13 ("Policy") 3–4 (Dkt. No. 67).)[3] IndyMac also obtained a lender's title insurance policy from Chicago Title Insurance Company ("CTIC"), dated August 3, 2007, and issued by Perfect Abstract, Inc. (*See* Pl.'s 56.1 ¶¶ 15, 17; Def.'s 56.1 Resp. ¶¶ 15, 17.) The CTIC policy insured that the IndyMac Mortgage was in a first lien position. (*See* Pl.'s 56.1 ¶ 18, Def.'s 56.1 Resp. ¶ 18.)

### 3. Default and Foreclosure Actions

In May 2008, the Quattrocchis defaulted on the loan with Emigrant. (*See* Def.'s 56.1 ¶ 24; Pl.'s 56.1 Resp. ¶ 24.) In August 2008, Emigrant's counsel, William Rifkin, Esq. ("Rifkin"), received a document listing a "Prior Mortgage," and naming the Quattrocchis as the mortgagors and "Mortgage Electronic Registration Systems, Inc., as Nominee for IndyMac Bank, FSB." (O'Donnell Decl. Ex. 21 ("Title Report") 5; *see also* Def.'s 56.1 ¶¶ 28–29; Pl.'s 56.1 Resp. ¶¶ 28–29.)[4] The date of the "Prior Mortgage" was August 3, 2007, and the date recorded was August 27, 2007. (*See* Title Report 4; *see also* Def.'s 56.1 ¶ 29; Pl.'s 56.1 Resp. ¶ 29.)

Emigrant filed its foreclosure action (the "Emigrant Foreclosure") on October 14, 2008 and did not name IndyMac in the complaint. (*See* Def.'s 56.1 ¶¶ 31–32; Pl.'s 56.1 Resp. ¶¶ 31–32.)

---

[3] The pages of the Policy are unnumbered. (*See* Policy.) Page numbers refer to the ECF-generated page number in the upper right-hand corner of the page.

[4] The Parties dispute whether this document should be characterized as a "title report," (*see* Def.'s 56.1 ¶¶ 28–29), or a "foreclosure certificate," (*see* Pl.'s 56.1 Resp. ¶¶ 28–29), but the distinction is immaterial for the purpose of resolving the instant Motions.

In March 2009, IndyMac filed a foreclosure action and named Emigrant as a defendant and junior lienholder, claiming the Emigrant Mortgage was subordinate to that of IndyMac (the "IndyMac Foreclosure"). (*See* Def.'s 56.1 ¶¶ 38–39; Pl.'s 56.1 Resp. ¶¶ 38–39; Pl.'s 56.1 ¶ 25; Def.'s 56.1 Resp. ¶ 25.) On March 30, 2009, IndyMac attempted to serve its complaint on Emigrant. (*See* Def.'s 56.1 ¶¶ 40–42; Pl.'s 56.1 Resp. ¶¶ 40–42.) The affidavit of service indicates that "a true copy of [the summons and complaint was delivered] to Susanne Wolfel, Assistant Vice President" of Emigrant, who "knew . . . the corporation described as the named defendant and knew said individual to be the AUTHORIZED AGENT thereof." (O'Donnell Decl. Ex. 27.) Wolfel admitted that "she was authorized to accept service on Emigrant's behalf and was present at the [bank's] branch on March 30, 2009." (*See* Def.'s 56.1 ¶ 41; Pl.'s 56.1 Resp. ¶ 41.)[5] Ms. Wolfel "claimed that she did not 'recall' being served," (Def.'s 56.1 ¶ 42; Pl.'s 56.1 Resp. ¶ 42), but "given [her] training and experience and Emigrant's procedures for logging legal papers related to mortgage loans served on it, [she] [did] not believe [she] could have been served as alleged in the affidavit of service," (Pl.'s 56.1 Resp. ¶ 42 (internal quotation marks omitted)).

Emigrant did not answer the IndyMac Foreclosure complaint and on July 2, 2009, IndyMac obtained a final judgment of foreclosure of $591,459.40. (*See* Def.'s 56.1 ¶¶ 43–44, 46; Pl.'s 56.1 Resp. ¶¶ 43–44, 46; Pl.'s 56.1 ¶ 28; Def.'s 56.1 Resp. ¶ 28.) On November 17, 2009, at a referee sale of the Subject Property, IndyMac placed a winning bid of $1,000, and subsequently assigned title to the Subject Property to its subsidiary. (*See* Def.'s 56.1 ¶¶ 45, 47; Pl.'s 56.1 Resp. ¶¶ 45, 47; Pl.'s 56.1 ¶¶ 29–30; Def.'s 56.1 Resp. ¶¶ 29–30.)

---

[5] Emigrant asserts that it "has no record of service of the [c]omplaint in the IndyMac Foreclosure, and was not served." (Pl.'s 56.1 Resp. ¶ 40.)

On January 7, 2010, the Quattrocchis filed for bankruptcy. (*See* Def.'s 56.1 ¶ 64; Pl.'s 56.1 Resp. ¶ 64.) In their bankruptcy petition, the Quattrocchis listed the Subject Property as "property that has been repossessed by a creditor, sold at a foreclosure sale, [or] transferred through a deed" on July 2, 2009. (*See* Def.'s 56.1 ¶ 65 (internal quotation marks omitted); Pl.'s 56.1 Resp. ¶ 65; *see also* O'Donnell Decl. Ex. 36 ("Bankruptcy Petition").) Emigrant's attorney, Rifkin, reviewed the Quattrocchis' bankruptcy petition. (*See* Def.'s 56.1 ¶ 66; Pl.'s 56.1 Resp. ¶ 66.) Emigrant did not file a non-dischargeability claim in the Quattrocchis' bankruptcy action. (*See* Def.'s 56.1 ¶ 68; Pl.'s 56.1 Resp. ¶ 68.) John Quattrocchi has testified that the Quattrocchis' records were destroyed following their 2010 bankruptcy. (*See* Def.'s 56.1 ¶ 70; Pl.'s 56.1 Resp. ¶ 70.)

On July 12, 2010, the IndyMac subsidiary sold the Subject Property to a third-party purchaser, Ravi Buckredan. (*See* Def.'s 56.1 ¶ 48; Pl.'s 56.1 Resp. ¶ 48.)

### 4. Emigrant's Claim to Commonwealth

On November 3, 2010, Emigrant submitted a claim to Commonwealth under the Policy. (*See* Pl.'s 56.1 ¶ 36; Def.'s 56.1 Resp. ¶ 36; Def.'s 56.1 ¶ 71; Pl.'s 56.1 Resp. ¶ 71.) In its claim letter, Rifkin stated that "on November 2, 2010, [he] discovered that on March 23, 2009, IndyMac Bank commenced an action to foreclose on its mortgage against the [Subject Property], alleging that it had a first mortgage" and asked Commonwealth to "remit the sum of $750,000.00 to Emigrant." (O'Donnell Decl. Ex. 37 ("Nov. 3, 2010 Letter") 2; *see also* Def.'s 56.1 ¶ 72; Pl.'s 56.1 Resp. ¶ 72.) In a letter dated November 22, 2010, Commonwealth denied Emigrant's claim. (*See* O'Donnell Decl. Ex. 38; Pl.'s 56.1 ¶ 37; Def.'s 56.1 Resp. ¶ 37; Def.'s 56.1 ¶ 75; Pl.'s 56.1 Resp. ¶ 75.) On January 24, 2011, Emigrant requested Commonwealth reconsider its denial of the claim. (*See* O'Donnell Decl. Ex. 39; Pl.'s 56.1 ¶ 38; Def.'s 56.1 Resp. ¶ 38; Def.'s 56.1 ¶ 77;

Pl.'s 56.1 Resp. ¶ 77.) On February 15, 2011, Commonwealth responded to the reconsideration request by informing Rifkin that it "ha[d] no obligation at [that] juncture to contest the results of the [IndyMac] Foreclosure . . . because the entry of the foreclosure judgment ha[d] robbed it of its opportunity to do so." (O'Donnell Decl. Ex. 40 ("Feb. 15, 2011 Letter") 1–2; *see also* Pl.'s 56.1 ¶ 39; Def.'s 56.1 Resp. ¶ 39; Def.'s 56.1 ¶ 78; Pl.'s 56.1 Resp. ¶ 78.) Emigrant did not respond to Commonwealth's February 15, 2011 letter. (*See* Def.'s 56.1 ¶ 79; Pl.'s 56.1 Resp. ¶ 79.)

On January 13, 2012, Emigrant filed an action against Boleslawski, asserting claims of fraud and unjust enrichment. (*See* Def.'s 56.1 ¶ 80; Pl.'s 56.1 Resp. ¶ 80.) Emigrant sought to add Ned Kopald, Esq. ("Kopald") as a defendant, but the court denied the motion "without prejudice to [Emigrant's] right to commence a separate plenary cause of action against [Kopald]." (O'Donnell Decl. Ex. 43, at 5; *see also* Def.'s 56.1 ¶ 81; Pl.'s 56.1 Resp. ¶ 81.) On January 19, 2016, Emigrant dismissed the action against Boleslawski with prejudice. (*See* O'Donnell Decl. Ex. 47; Def.'s 56.1 ¶ 87; Pl.'s 56.1 Resp. ¶ 87.)

### 5. The Order To Show Cause

On November 11, 2010 "Emigrant filed an Order [T]o Show Cause in the IndyMac Foreclosure seeking to vacate the judgment." (Def.'s 56.1 ¶ 51; Pl.'s 56.1 Resp. ¶ 51; *see also* O'Donnell Decl. Ex. 31 ("Order To Show Cause").) On April 6, 2011, the New York State Supreme Court denied Emigrant's application. (*See* Decl. of Michael J. Schwarz, Esq. ("Schwarz Decl.") Ex. HH ("Denial of Vacatur") (Dkt. No. 62); *see also* Def.'s 56.1 ¶ 56; Pl.'s 56.1 Resp. ¶ 56).) Emigrant appealed the Supreme Court's decision and the Appellate Division affirmed the denial of the Order To Show Cause. (*See* Def.'s 56.1 ¶¶ 60, 62; Pl.'s 56.1 Resp. ¶¶ 60, 62.)

B.  Procedural History

Plaintiff filed this Action in New York State Supreme Court on August 26, 2015.  (*See* Compl.)  Defendant removed the Action on September 25, 2015, (*see* Dkt. No. 1), and Defendant filed an Answer on October 22, 2015, (*see* Dkt. No. 8).

On February 2, 2017, the Parties filed their Motions for Summary Judgment and supporting papers.  (*See* Dkt. Nos. 59–63, 65, 66–69.)  The Parties filed papers in opposition on March 30, 2017.  (*See* Dkt. Nos. 72–78.)

## II.  Discussion

A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

 "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come

forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of N.Y.C.*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,

164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks omitted)).

B. Analysis

In its Motion, Emigrant argues that it "has demonstrated its prima facie entitlement to summary judgment . . . by establishing it . . . possessed a valid lender's policy for title insurance (for which a premium was paid), and . . . suffered a loss within the meaning of that [P]olicy." (Pl. Emigrant Bank's Mem. of Law in Supp. of Their [sic] Mot. for Summ. J. ("Pl.'s Mem.") 2 (Dkt. No. 63) (italics omitted).) Commonwealth contends that "[h]ad Emigrant provided proper notice [pursuant to the terms of the Policy], . . . Commonwealth would have had various options to establish the priority of Emigrant's lien—and to explore potential defenses—and then recoup its losses by pursuing others who may have been involved in an underlying fraud regarding the mortgages." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") 2 (Dkt. No. 69).)

"[A] policy of title insurance is a contract by which the title insurer agrees to indemnify its insured for loss occasioned by a defect in title." *L. Smirlock Realty Corp. v. Title Guar. Co.*,

418 N.E.2d 650, 653 (N.Y. 1981).  Such a policy "insures against loss by reason of defective titles and encumbrances and insures the correctness of searches for all instruments, liens or charges affecting the title to such property."  *Citibank, N.A. v. Commonwealth Land Title Ins. Co.*, 645 N.Y.S.2d 826, 827 (App. Div. 1996) (alteration and internal quotation marks omitted). "Since the title insurer's liability to its insured is based, in essence, on contract law, that liability is governed and limited by the agreements, terms, conditions, and provisions contained in the title insurance policy."  *Nastasi v. County of Suffolk*, 966 N.Y.S.2d 172, 174 (App. Div. 2013). "In general, a title insurer will be liable for hidden defects and all matters affecting title within the policy coverage and not excluded or specifically excepted from said coverage."  *Id.* (internal quotation marks omitted).

> The instant Policy
>
> insures . . . against loss or damage . . . sustained or incurred by [Emigrant] by reason of . . .
>
> 10.  The lack of priority of the lien of the [Emigrant] Mortgage upon the Title over any other lien or encumbrance. . . .
>
> 14.  Any defect in or lien or encumbrance on the Title or other matter . . . that has been created or attached or has been filed or recorded in the Public Records subsequent to [the] [d]ate of Policy and prior to the recording of the [Emigrant] Mortgage in the Public Records.

(Policy 3–4.)  Excluded from coverage are "[d]efects, liens, encumbrances, adverse claims, or other matters . . . created, suffered, assumed, or agreed to by [Emigrant]."  (*Id.* at 5.)

### 1.  Knowledge of the Superior Mortgage

It is well-settled that "[u]nder New York law, compliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy."  *Sparacino v. Pawtucket Mut. Ins.*, 50 F.3d 141, 143 (2d Cir. 1995).  Here, under the subsection titled "Notice of Claim to be Given by Insured Claimant," the Policy provides that

> [Emigrant] shall notify [Commonwealth] promptly in writing (i) in case of any litigation as set forth in [§] 5(a) of these Conditions, (ii) in case Knowledge shall come to [Emigrant] of any claim of title or interest that is adverse to the Title or the lien of the [Emigrant] Mortgage, as insured, and that might cause loss or damage for which [Commonwealth] may be liable by virtue of this [P]olicy, or (iii) if the Title or the lien of the [Emigrant] Mortgage, as insured, is rejected as Unmarketable Title.  If [Commonwealth] is prejudiced by the failure of [Emigrant] to provide prompt notice, [Commonwealth's] liability to [Emigrant] under the [P]olicy shall be reduced to the extent of the prejudice.

(Policy 10.)[6]  Commonwealth avers that "Emigrant had knowledge of the IndyMac [M]ortgage well before it gave notice to Commonwealth" in November 2010.  (Def.'s Mem. 12.)  In support of this contention, Defendant cites (1) Rifkin's knowledge of the prior mortgage in summer of 2008; (2) the service of the IndyMac Foreclosure complaint on Emigrant's agent in March 2009; and (3) the service of the Quattrocchis' bankruptcy petition on Rifkin in January 2009.  (*See id.* at 12–16.)  The Court considers each argument in turn.

### a.  The Summer 2008 Title Search

In August 2008, in connection with Emigrant's foreclosure action, Rifkin conducted a title search to determine whether any liens other than the Emigrant Mortgage encumbered the Subject Property.  (*See* O'Donnell Decl. Ex. 22 ("Kandel Dep.") 117–18 ("Q. What is the purpose of this foreclosure search? . . .  A. To see what liens of record exist[] against the property that you are foreclosing against."); *id.* at 125 ("Q. Are these searches run so that a lender can determine what parties to name as a [d]efendant in a foreclosure matter?  A. The

---

[6] In relevant part, § 5(a) states

> Upon written request by [Emigrant], and subject to the options contained in [§] 7, of these Conditions, [Commonwealth], at its own cost and without unreasonable delay, shall provide for the defense of [Emigrant] in litigation in which any third party asserts a claim covered by this [P]olicy adverse to [Emigrant]. This obligation is limited to only those stated causes of action alleging matters insured against by this [P]olicy.

(Policy 10.)

searches are run by foreclosure counsel, and that is one of the purposes that foreclosure counsel would run it.").)  As a result of the search, Rifkin uncovered what Defendant deems a "title report" and what Plaintiff asserts is a "foreclosure certificate," (*compare* Def.'s 56.1 ¶¶ 28–29 *with* Pl.'s 56.1 Resp. ¶¶ 28–29), stating that IndyMac held a "Prior Mortgage" on the Subject Property, dated August 3, 2007, (*see* Title Report).  Plaintiff contends that this "foreclosure certificate was not transmitted to Emigrant by Rifkin, or discussed with Emigrant in 2008," (*see* Pl.'s 56.1 Resp. ¶ 29), but Emigrant does not dispute that Rifkin received the document and admits that it "expected Rifkin to inform it of the results of the [search]," (Def.'s 56.1 ¶ 30; Pl.'s 56.1 Resp. ¶ 30).  At Rifkin's deposition, Emigrant asserted attorney-client privilege over questions regarding what information Rifkin conveyed to his client.  (*See* O'Donnell Decl. Ex. 23 ("Rifkin Dep.") 28.)

The Parties dispute whether Rifkin's knowledge of the IndyMac Mortgage as a result of the title search can be imputed to Emigrant and constitute "actual knowledge" pursuant to the Policy.  Defendant asserts that "[a] principal is bound by notice to its agent in all matters within the scope of the agency, regardless of if the information is actually communicated to the principal."  (Def.'s Mem. 13 (internal quotation marks omitted).)  Plaintiff contends that "where actual knowledge is required by a title insurance policy, knowledge imputed by law from an agent to his principal is irrelevant."  (Pl. Emigrant Bank's Mem. of Law in Opp'n to Def. Commonwealth Land Title Ins. Co.'s Mot. for Summ. J. ("Pl.'s Opp'n") 11 (Dkt. No. 74) (internal quotation marks omitted).)

"It is well settled under New York law that "[a] principal is bound by notice to or knowledge of his agent in all matters within the scope of his agency [even though] the information may never actually have been communicated to the principal."  *Farr v. Newman*,

199 N.E.2d 369, 371 (N.Y. 1964) (citation omitted); *see also Veal v. Geraci*, 23 F.3d 722, 725

(2d Cir. 1994) ("The relationship between an attorney and the client he or she represents in a

lawsuit is one of agent and principal."); *Schwab v. Philip Morris USA, Inc.*, No. 04-CV-1945,

2005 WL 2467766, at *3 (E.D.N.Y. Oct. 6, 2005) ("In a conventional attorney-client

relationship, the attorney's knowledge is imputed to the client.").  "This principle applies equally

in the context of insurance notice requirements." *Clifton Park Food Corp. v. Travelers Indem.

Co.*, No. 08-CV-1200, 2010 WL 3418555, at *3 (N.D.N.Y. Aug. 28, 2010); *see also In re

Altmeyer*, 268 B.R. 349, 357 (Bankr. W.D.N.Y. 2001) ("With regard to an examination of title,

the knowledge of an attorney is fully attributable to the clients."); *Kmart Corp. v. First Hartford

Realty Corp.*, 810 F. Supp. 1316, 1329 (D. Conn. 1993) ("Having delegated all the title issues to

[the agent], and having directed him to act as their de facto attorney throughout the transaction,

the court concludes that [the agent's] actual knowledge of the content of the lease must be

imputed to [the agent's client]."); *Martin Assocs., Inc. v. Illinois Nat'l Ins. Co.*, 27 N.Y.S.3d 21,

22 (App. Div. 2016) (finding in the context of a claim for liability insurance that "[t]he

information in its attorneys' possession [was] imputed to [the client]") (citing *Smalls v. Reliable

Auto Serv.*, 612 N.Y.S.2d 674 (App. Div. 1994))); *Laera v. Molina*, 473 N.Y.S.2d 571, 573

(App. Div. 1984) (finding that despite the fact that the plaintiff "denied knowledge of an

easement mentioned in his deed, title report or title insurance policy," the fact that the plaintiff

"was represented by counsel at all times with respect to the purchase of his premises" meant that

"the knowledge of the attorney as to the easement created by the deed [was] imputable to his

client"); *see also* 7A Corpus Juris Secundum, Attorney & Client § 262 (2017) ("A person who

has dealings which involve real property . . . is usually chargeable with knowledge of, or notice

to, his or her attorney concerning matters affecting title to, or rights or interests in, such property,

acquired or obtained in the course of the attorney's employment in connection with such property.").

Emigrant argues that "[t]he Policy does not define 'actual knowledge' as knowledge which may be imputed to [Emigrant] through an agent" and that "[i]n fact, the Policy does not define the term at all." (Pl.'s Opp'n 11.) Emigrant contends that, therefore, "the Policy is ambiguous, and that ambiguity must be construed in Emigrant's favor." (*Id.*) The Policy defines "Knowledge," as "[a]ctual knowledge, not constructive knowledge or notice that may be imputed to [Emigrant] by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title." (Policy 9.)

Under the principle of *expressio unius est exclusio alterius*, the decision to exclude only one specific type of knowledge from the Policy's definition of knowledge suggests that all other types of knowledge—including knowledge imputed to a principal from an agent—fall within the definition. *See VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 & n.12 (2d Cir. 2001) ("To express or include one thing implies the exclusion of the other . . . ." (alteration and internal quotation marks omitted)); *Gurney's Inn Resort & Spa Ltd. v. Benjamin*, 878 F. Supp. 2d 411, 425 (E.D.N.Y. 2012) ("Under the doctrine of *expressio unius est exclusion alterious* [sic], when certain persons or categories are specified in a contract, an intention to exclude all others may be inferred."); *see also Expressio unius est exclusion alterius*, Black's Law Dictionary (10th ed. 2014) ("A canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative."). The Policy's silence as to knowledge imputed by reason of a principal/agent relationship suggestions it is not included in the definition.

Plaintiff additionally contends that "there is no evidence to suggest that the filing of a title claim was within the scope of authority of Rifkin in 2008, as Emigrant's foreclosure

counsel." (Pl.'s Opp'n 11 n.7.) As counsel in connection with Emigrant's foreclosure action, Rifkin either performed a title search, or at least received a report as a result of someone else's title search, indicating that IndyMac held a prior mortgage on the Subject Property. (*See* Kandel Dep. 121 ("Q. To your knowledge, did the Belkin, Burden firm receive this title search? A. My understanding is they did.").) To the extent Plaintiff claims that performing or receiving the results of the title search was within the scope of Rifkin's authority, but the filing of a claim pursuant to the results of such as search were not, the Court finds this argument unpersuasive. Additionally, filing a title claim was squarely within the scope of Rifkin's authority as Emigrant's counsel in 2010, as evidenced by the very filing of a claim with Commonwealth in November 2010. (*See* Nov. 3, 2010 Letter.)

Finally, Plaintiff argues that "even if Rifkin's knowledge may be imputed to Emigrant, and even if the filing of a title claim was within the scope of Rifkin's authority . . . , Rifkin acted adversely to the interests of his alleged principal, Emigrant, so imputation is improper." (Pl.'s Opp'n 13.) Plaintiff cites a single case, *Fitch, Cornell & Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 155 N.Y.S. 1079 (App. Div. 1915), *aff'd*, 123 N.E. 864 (N.Y. 1919), in support of this proposition. *Fitch, Cornell* is distinguishable as there, the court found that the knowledge in question was "[ac]quired by an agent in the commission of a fraud upon his principal" and therefore, it was not "presumed that such knowledge [would] be communicated to the principal or used for his benefit." *Id.* at 1082–83. Plaintiff does not identify the adverse action Rifkin took, but the Court assumes that Plaintiff is referencing Rifkin's failure to communicate the results of the title search to his client. (*See* Pl.'s Opp'n 12 n.9 ("Rifkin never communicated with Emigrant about the [prior mortgage] issue.").) This argument renders the very principle of imputation toothless. The failure to directly communicate information to a client will

16

presumably *always* be adverse to the principal, but this does not change the standard of imputation. *See SEC v. McNulty*, 137 F.3d 732, 739 (2d Cir. 1998) ("Normally, the conduct of an attorney is imputed to his client, for allowing a party to evade 'the consequences of the acts or omissions of []his freely selected agent' 'would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent.'" (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962))); *see also United States v. Goldstein*, 216 F. App'x 62, 64 (2d Cir. 2007) (same). Thus, the Court finds that Rifkin's knowledge of the prior IndyMac Mortgage can be imputed to Emigrant.

### b. The March 2009 Service of the IndyMac Foreclosure Complaint

Defendant argues that "[i]n March 2009, Emigrant was again advised of IndyMac's claimed priority when it was served with IndyMac's Foreclosure [c]omplaint," which specifically alleged that Emigrant was the holder of a subordinate mortgage on the Subject Property. (Def.'s Mem. 14–15.) Plaintiff contends that it "had (and has) no record of being served in that action," and accordingly, it did not answer IndyMac's complaint. (Pl.'s Opp'n 7.) As a result, default was entered against Emigrant, and on July 2, 2009, IndyMac obtained a final judgment of foreclosure. (*See* Def.'s 56.1 ¶¶ 43–44, 46; Pl.'s 56.1 Resp. ¶¶ 43–44, 46; Pl.'s 56.1 ¶ 28; Def.'s 56.1 Resp. ¶ 28.)

In an effort to vacate that judgment, Emigrant filed an Order To Show Cause in New York State Supreme Court. (*See* Order To Show Cause; Def.'s 56.1 ¶ 51; Pl.'s 56.1 Resp. ¶ 51.) Defendant contends that the state court's finding "that Emigrant failed to rebut the presumption of proper service . . . should be given preclusive effect here." (Def.'s Mem. 15 (arguing for the application of the doctrine of collateral estoppel).)

Collateral estoppel, also known as issue preclusion, provides that "when an issue of ultimate fact has once been determined by a valid and final judgment, the issue cannot again be litigated between the same parties in any future lawsuit." *Swiatkowski v. Citibank*, 745 F. Supp. 2d 150, 168 (E.D.N.Y. 2010) (internal quotation marks omitted), *aff'd*, 446 F. App'x 360 (2d Cir. 2011); *see also Tracy v. Freshwater*, 623 F.3d 90, 99 (2d Cir. 2010) ("Collateral estoppel precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party." (internal quotation marks omitted)). Therefore, collateral estoppel will preclude a court from deciding an issue where "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir. 2007) (internal quotation marks omitted); *see also Hayes v. County of Sullivan*, 853 F. Supp. 2d 400, 425 (S.D.N.Y. 2012) (same). "The party asserting issue preclusion bears the burden of showing that the identical issue was previously decided, while the party against whom the doctrine is asserted bears the burden of showing the absence of a full and fair opportunity to litigate in the prior proceeding." *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995); *see also Thomas v. Venditto*, 925 F. Supp. 2d 352, 360 (E.D.N.Y. 2013) (same).

Emigrant argues that "when viewed in a light most favorable to Emigrant, the 'proof' shows that Emigrant possessed no records of service, and was not aware of the [c]omplaint in the IndyMac Foreclosure . . . until November 3, 2010." (Pl.'s Opp'n 14 (citations omitted).) Emigrant further asserts that "the doctrine of collateral estoppel has no application" because "the issues of Emigrant's 'actual knowledge' of the senior IndyMac Mortgage, or the timeliness of

Emigrant's notice to Commonwealth, were not actually litigated or determined (or even implicated) in the IndyMac Foreclosure . . . , and resulting appeal." (*Id.*)

In a Decision & Order dated April 6, 2011, Judge William A. Kelly of the New York State Supreme Court for Rockland County noted that "[a] defendant seeking to vacate a default judgment must demonstrate a reasonable excuse for failing to appear in the action and a meritorious defense." (Denial of Vacatur 2.) Judge Kelly held that "[t]he basis of . . . Emigrant's application [was] that service upon [it] was not made," (*id.* at 3), the very same argument it asserts here to rebut Defendant's claim of notice, (*see* Pl.'s Opp'n 14 ("Emigrant possessed no records of service . . . .")). Citing Emigrant's allegations that "Emigrant ha[d] no record of being served," and that its designated agent did "not believe [she] could have been served as alleged," Judge Kelly found that "[t]he mere denial of receipt of the summons [was] insufficient to rebut the presumption of proper service" and that "[Emigrant] fail[ed] to effectively controvert the affidavit of service or demonstrate the existence of a valid jurisdictional defense." (Denial of Vacatur 3–4 (internal quotation marks omitted).) In light of these findings, there is no question that the issue of whether the summons and complaint in the IndyMac Foreclosure were served on Emigrant was "actually and necessarily decided," and that Emigrant "had a full and fair opportunity to litigate the issue." *McKithen*, 481 F.3d at 105. Indeed, it was the very basis for Emigrant's Order To Show Cause and Judge Kelly's ruling. Accordingly, the Court finds that Emigrant is collaterally estopped from raising the lack of record of service in this Action. Thus, by service of the summons and IndyMac Foreclosure complaint upon Emigrant's agent in March 2009, Emigrant had notice of the IndyMac Mortgage.

<u>c. The January 2010 Quattrocchi Bankruptcy Petition</u>

Finally, Defendant asserts that Plaintiff was "*again* advised of a potential title claim in January 2010 via the Quattrocchis' bankruptcy petition, which disclosed that the [Subject] Property had been subject to a 'repossession, foreclosure sale, transfer or return' in favor of IndyMac in July 2009." (Def.'s Mem. 16.) Rifkin monitored the Quattrocchis' bankruptcy and reviewed their bankruptcy petition. (*See* Rifkin Dep. 44 ("Q. Who monitored the bankruptcy? A. Myself and Stewart Smith. Q. Did you review the bankruptcy petition? A. Yes.").) The petition stated that IndyMac obtained title to the Subject Property on July 2, 2009. (*See* Bankruptcy Petition; *see also* Rifkin Dep. 45 ("Q. And if we look at page 40, it says, . . . 'Repossessions, foreclosures and returns,' and it identifies that on July 2, 2009, IndyMac obtained title to 5 Perrins Peak, Stony Point, New York, correct? A. Yes. Q. And that Perrins Peak property is the property that Emigrant was also foreclosing on? A. Correct.").)

For the reasons stated above in connection with the 2008 title search, Rifkin's knowledge is imputed to Emigrant. The Court thus turns to the question of whether Commonwealth was prejudiced by this late notice.

### 2. Prejudice to Commonwealth

The Policy's notice provision states that "[i]f [Commonwealth] is prejudiced by the failure of [Emigrant] to provide prompt notice, [Commonwealth's] liability to [Emigrant] under the [P]olicy *shall be reduced to the extent of the prejudice*." (Policy 10 (emphasis added).)[7]

---

[7] The Court notes that this Action does not involve the application or interpretation of New York's former "no prejudice" rule. Under the no prejudice rule, "the notice provision for a primary insurer operate[d] as a condition precedent and . . . the insurer need not [have] show[n] prejudice to rely on the defense of late notice." *Unigard Sec. Ins. Co. v. North Riv. Ins. Co.*, 594 N.E.2d 571, 573 (N.Y. 1992). This common-law rule has since been legislatively abrogated as to insurance policies issued post-January 17, 2009. *See* N.Y. Ins. Law § 3420(a)(5).

Emigrant argues that, even assuming it had actual knowledge of the IndyMac Mortgage, "Commonwealth's putative notice defense is patently without merit because Commonwealth has failed to meet its burden of establishing, as a matter of law, actual prejudice resulting from [the] alleged delay in receiving notice." (Pl.'s Opp'n 15; *see also* Pl.'s Mem. 2 ("[A]ny alleged delay in providing notice (which is not conceded) *does not* act as [an] absolute bar [to] recovery, and there is absolutely no proof to establish the 'extent' of the prejudice allegedly suffered by Commonwealth as a result of Emigrant's notice.").) While Defendant concedes that "it is impossible to determine with any certainty exactly what Commonwealth could have done due to Emigrant's malfeasance," it asserts that "Emigrant's delay did prevent Commonwealth from asserting meritorious defenses and pursuing viable recoupment options." (Def.'s Mem. 19; *see also* Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n") 1 (Dkt. No. 77) ("Emigrant's delay [in providing notice] prohibited Commonwealth from defending/establishing the priority of the Emigrant Mortgage, negotiating with IndyMac, and or/otherwise recovering from other parties.").)

While a "general claim" of prejudice is insufficient to establish prejudice, *Plaza ex rel. Rodriguez v. N.Y. Health & Hosp. Corp.*, 949 N.Y.S.2d 25, 31 (App. Div. 2012), here, Defendant argues that as a result of Emigrant's actions, it was prejudiced by its inability to raise an equitable subrogation defense (and other defenses) in the IndyMac Foreclosure, was denied an opportunity to investigate fraud allegations, was deprived of the ability to negotiate and settle

_____

In any event, the no prejudice rule could not apply to the instant Policy which specifically contemplates a showing of prejudice to reduce Commonwealth's liability. (*See* Policy 9 ("If [Commonwealth] is prejudiced by the failure of the Insured Claimant to provide prompt notice, [Commonwealth's] liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.").) This language necessarily indicates that "prejudice from late notice is to be demonstrated, not presumed." *Conergics Corp. v. Dearborn Mid-West Conveyor Co.*, 43 N.Y.S.3d 6, 12 (App. Div. 2016).

with IndyMac for less than the $750,000 Emigrant now seeks, and was unable to pursue various avenues of recoupment, (*see generally* Def.'s Mem. 19–25).

"[L]ate notice actually prejudices the indemnitor when it results in a material deprivation of the indemnitor's right to control the defense of the claim, a proposition that finds support in existing case law." *Conergics Corp. v. Dearborn Mid-West Conveyor Co.*, 43 N.Y.S.3d 6, 16 (App. Div. 2016) (discussing *Wainco Funding v. First Am. Title Ins. Co. of N.Y.*, 631 N.Y.S.2d 81 (App. Div. 1995) and *American Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435 (2d Cir. 1995)). In *Wainco*, the policy at issue provided that failure to provide notice would not affect the rights of the insured "unless the insurer shall be actually prejudiced by such failure." 631 N.Y.S.2d at 82 (alteration and internal quotation marks omitted). The Appellate Division held that the insurer was "actually prejudiced" because the delay in notice "depriv[ed] [it] of the opportunity to participate in the [subject] tax lien proceeding in any way." *Id.* Similarly, in *Fairchild*, under a policy that "required a showing of prejudice from late notice," the Second Circuit held that where late notice resulted in "the very deprivation of an opportunity to play a meaningful role in the studies and negotiations that determine[d] the amount for which indemnification [was] sought" the result was "substantial prejudice to [the] insurer." 56 F.3d at 440; *see also Valcon Am. Corp. v. CTI Abstract of Westchester*, 958 N.Y.S.2d 64, 2010 WL 3385590, at *2 (N.Y. Sup. Ct. Mar. 16, 2010) ("To the extent [the defendant] was not aware of the [l]awsuit or the resultant [i]njunction until after all opportunity to modify or appeal was barred, such delay constitutes actual prejudice."); *Hartford Fire Ins. Co. v. Baseball Office of the Comm'r*, 654 N.Y.S.2d 21, 22 (App. Div. 1997) (affirming a grant of summary judgment where "[the] defendants' delayed notification . . . precluded a timely investigation of [the] defendants' claims and the chance to effect an early settlement").

In opposition to Defendant's Motion, Plaintiff cites *U.S. Bank Nat'l Assoc. TR U/A DTD 12/01/98 v. Stewart Title Ins. Co.*, 832 N.Y.S.2d 223 (App. Div. 2007), where the Appellate Division held that "the defendant's allegations of prejudice on the ground that the plaintiff's alleged untimely notice prevented it from participating in the . . . foreclosure action so as to mitigate its liability and protect its interests were purely speculative and questionable in light of the apparent lack of equity in the property." *Id.* at 226. Plaintiff argues that because the IndyMac Mortgage had priority over the Emigrant Mortgage under New York's Recording Act as a matter of law, "Commonwealth's claimed [subrogation] defense . . . is unavailing." (Pl.'s Opp'n 17.) "Under the doctrine of equitable subrogation, where the 'property of one person is used in discharging an obligation owed by another or a lien upon the property of another, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee or lien-holder.'" *First Franklin Fin. Corp. v. Beniaminov*, 42 N.Y.S.3d 46, 48 (App. Div. 2016) (quoting *King v. Pelkofski*, 229 N.E.2d 435, 439 (N.Y. 1967); *see also Ispat Inland, Inc. v. Kemper Envtl., Ltd.*, No. 05-CV-5401, 2009 WL 4030858, at *9 (S.D.N.Y. Nov. 20, 2009) ("Subrogation . . . reduces the amount that an insurer expends in providing coverage, by permitting the insurer to recover money from a wrongdoer that contributed to the liability incurred by the insured.").

While the Court agrees that the IndyMac Mortgage was "first in time, first recorded, and insured as a first mortgage lien," as Plaintiff asserts, (Pl.'s Mem. 19), there is a dispute of fact as to whether equitable subrogation would have been a viable defense in the IndyMac Foreclosure had Defendant been timely notified, (*see* Order To Show Cause ¶ 7 ("[I]t was Emigrant that paid off these mortgages by paying Boleslawski $724,942.11, not IndyMac Bank." (emphasis omitted)); O'Donnell Decl. Ex. 16, at 1 ("I acknowledge receipt of [a] check . . . drawn on

[E]migrant Bank in the sum of $724,942.11 in payment of [two mortgages] . . . . The . . . two mortgages [were] with regard to the property located at 5 Perrins Peak Road, Stony Point, New York."); O'Donnell Decl. Ex. 4, at 128 ("Q. And which loan would Emigrant pay off? A. The two mortgages that were on . . . Perrins Peak.")).

Additionally, Commonwealth's expert, Bruce J. Bergman, Esq., contends that "Emigrant had a viable claim for equitable subrogation" that "could[] and should have been interposed as a defense . . . in the IndyMac Foreclosure," that a fraud claim "could and should have been pursued by way of objection to discharge in the Quattrocchis' bankruptcy," and that "actual knowledge of a superior interest can reverse priority." (O'Donnell Decl. Ex. 51, at 26–27.) Emigrant's expert, Brett L. Messinger, Esq., asserts that Commonwealth's equitable subrogation "theory simply does not hold water based on the facts presented" and that "there was simply no prejudice to [Commonwealth] as a result of any late notice . . . . as there was no basis to subordinate IndyMac's Mortgage to Emigrant's." (Decl. of Michael J. Schwarz, Esq. in Opp'n to Def.'s Mot. for Summ. J. Ex. 2, at 16 (Dkt. No. 72).) "Where . . . there are conflicting expert reports presented, courts are wary of granting summary judgment." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002) (internal quotation marks omitted); *see also Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 418 (S.D.N.Y. 2012) ("In cases where credible expert reports conflict the case for summary judgment on the disputed issue is very weak."). And so it is here, as the Court cannot say as a matter of law that Defendant's purported defense would not have been successful.

In *Zev Cohen, LLC v. Fidelity Nat'l Title Ins. Co.*, 831 N.Y.S.2d 689 (N.Y. Sup. Ct. 2007), the title insurance policy at issue provided that

> If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for

> which prompt notice is required, *provided, however that failure to notify the Company shall in case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice*.

*Id.* at 696 (emphasis added). The court granted summary judgment in favor of the insurer, finding that "[the] [p]laintiff, without ever providing timely notice to [the insurer], [came] before th[e] [c]ourt in a belated attempt to saddle defendants with a purported obligation that [the insurer] had a meaningful opportunity to investigate, litigate or defend . . . ." *Id.* at 696–97.

Plaintiff attempts to distinguish *Zev Cohen*, and other authority Defendant cites, by noting that "the title policies in those cases expressly provided that liability terminated in the event that the untimely notice of claim caused prejudice to the title company." (Pl.'s Opp'n 22.) Plaintiff quotes the policies at issue in the referenced cases, truncating each quote at the word "terminate." (*See id.* at 22–23 (citing *Wainco*, 631 N.Y.S.2d at 82 ("The subject title insurance policy provides that in the event the insured failed to 'promptly notify' the insurer 'of any lien or encumbrance insured against,' the insurers liability *would terminate* . . . ."); *Valcon*, 2010 WL 3385590, at *2 ("[I]f prompt notice shall not be given to the company, then as to the insured all liability to the company *shall terminate* . . . ."); *Zev Cohen*, 831 N.Y.S.2d at 696 ("If prompt notice shall not be given to the Company, then as to the insured all liability of the company *shall terminate* . . . .")).) However, in each of the above quoted policies, the *full* notice provision states:

> If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; *provided, however, the failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice*.

*Valcon*, 2010 WL 3385590, at *2 (emphasis added); *see Wainco*, 631 N.Y.S.2d at 82 ("[The] [s]ubject title insurance policy provided that in event insured failed to promptly notify insurer of any lien or encumbrance . . . , insurer's liability would terminate, *provided that the failure to notify shall in no case prejudice the claim of any insured unless the insurer shall be actually prejudiced by such failure*." (emphasis added)); *see also Pike v. Conestoga Title Ins. Co.*, 44 N.E.3d 787, 788 (Ind. Ct. App. 2015) ("If prompt notice shall not be given . . . , then . . . all liability of the Company shall terminate . . . ; *provided however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by failure and then only to the extent of the prejudice*." (emphasis added)); *Washington Mut. Bank v. Commonwealth Land Title Ins. Co.*, No. 08-CV-256, 2010 WL 135685, at *1 (Tex. App. Jan. 14, 2010) ("If prompt notice shall not be given . . . , then . . . all liability . . . shall terminate . . . , *provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured . . . unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice*" (emphasis added)); *Countrywide Home Loans, Inc. v. Stewart Title Guar. Co.*, No. 06-CV-1254, 2007 WL 4613046, at *1 (E.D. Wis. Dec. 31, 2007) ("If prompt notice shall not be given . . . , then . . . all liability of Stewart Title shall terminate . . . ; *provided, however, that failure to notify Stewart Title shall in no case prejudice the rights of any insured under this policy unless Stewart Title shall be prejudiced by the failure and then only to the extent of the prejudice*." (emphasis added) (alterations omitted)).[8] Plaintiff fails to include this relevant language from the quoted policies, each of which specifically requires liability be reduced to the extent of the prejudice and mimics the language

---

[8] The full language of the policy at issue in *Washington Mutual Bank*, is cited in the appellee's brief. *See* Brief for Appellee at *5, *Washington Mut. Bank*, 2010 WL 135685.

in the instant Commonwealth Policy.  Plaintiff's attempt to distinguish this case law on this basis is unpersuasive.

Plaintiff also contends that "there is absolutely no proof to establish the '*extent*' of the prejudice allegedly suffered by Commonwealth as a result of Emigrant's notice."  (Pl.'s Mem. 2 (emphasis added); *see also* Pl.'s Opp'n 2 ("No proof has been offered on the motion (or produced during discovery) to establish the 'extent' of the alleged prejudice suffered by Commonwealth as a result of Emigrant's notice"); *id.* at 15 ("Commonwealth has failed to demonstrate the 'extent of the prejudice' allegedly suffered by it as a result of the alleged delay in providing notice."); *id.* at 22 ("Commonwealth failed to put forth any proof to establish the 'extent of the prejudice' suffered by it as a result of Emigrant's notice.  Thus, Commonwealth has failed to meet its burden, and summary judgment should denied."); *id.* at 23 ("Noticeably absent from Commonwealth's motion is any proof, or for that matter any claim or allegation, to establish the 'extent of prejudice' allegedly suffered . . . as a result of Emigrant's notice.").)  Plaintiff further asserts that "[t]he insurer must demonstrate that it was actually 'prejudiced in financial terms.'"  (Pl.'s Mem. 17; *see also* Pl.'s Opp'n 16 ("The insurer must submit proof that it was actually 'prejudiced in financial terms' by the alleged untimely notice.").)  Plaintiff offers no case law in support of this proposition and the Court is aware of no authority that requires a party to quantify its prejudice in the context of late notice.[9]  While Defendant has not provided a specific calculation and has noted that the prejudice is "unquantifiable," (Schwarz Decl. Ex. XX, at 170 ("[T]he prejudice that Emigrant has caused the company is unquantifiable, because we

---

[9] Plaintiff cites to *Moe v. Transamerica Title Insurance Co.*, 21 Cal. App. 3d 289, 302 (Ct. App. 1971) and *Crucible Materials Corp. v. Aetna Casualty & Surety Co.*, 228 F. Supp. 2d 182, 200 (N.D.N.Y. 2001), neither of which applies New York law nor speaks to quantifying prejudice in financial terms.

don't know what we could have determined through discovery in defense of Emigrant had Emigrant . . . reserved the right to defend [itself] in the foreclosure and notified the company.")), the inability to quantity the prejudice does not render it nonexistent. In *AXA Marine & Aviation Insurance (UK) Ltd. v. Seajet Industries Inc.*, 84 F.3d 622 (2d Cir. 1996), in the context of the former "no prejudice" rule, the Second Circuit noted that "[t]he value to an insurance company of the opportunity to settle a claim early should not be underestimated" even though "[i]t is difficult to quantify the prejudice to an insurer who has lost the opportunity to reach an early settlement." *Id.* at 627. "To prove prejudice, the insurer would have to show what the offer would have been and the likelihood that the injured party would have accepted it," a rule the Second Circuit found was unfair to insurers. *Id.*; *see also Endo Pharms. Inc. v. Amneal Pharms., LLC*, Nos. 12-CV-8115, 12-CV-8060, 12-CV-8317, 12-CV-8985, 13-CV-435, 13-CV-436, 13-CV-3288, 13-CV-4343, 13-CV-8597, 2016 WL 1732751, at *6 (S.D.N.Y. Apr. 29, 2016) (issuing an injunction, despite the finding that "legal remedies may not be able to adequately compensate for harms that are difficult to quantify").

Defendant's inability to *quantify* the prejudice suffered does not negate the fact that it was indeed prejudiced by the denial of a "meaningful opportunity to investigate, litigate or defend" in the IndyMac Foreclosure—a consequence of Plaintiff's late notice. *Zev Cohen*, 831 N.Y.S.2d at 696–97.

The Court also finds that Defendant has established it was prejudiced by being denied alleged opportunities for recoupment. (*See* Def.'s Mem. 22–25.) In particular, Defendant notes that it has been unable to seek recoupment because "Emigrant did not contest the discharge of its debt in the Quattrocchis' bankruptcy" despite its suspicions of fraud, (*id.* at 23), "Emigrant never pursued Discount [Funding] or otherwise sought indemnification . . . , despite the loan

application unquestionably containing false representations," (*id.* at 23–24), Emigrant "could have sought more information from [mortgage broker James] Contacessa and/or pursued him for fraud," (*id.* at 24), "Emigrant inexplicably abandoned any pursuit of [attorney Ned] Kopald," (*id.* at 25), and Emigrant "discontinued its action against [Boleslawski]—with prejudice," (*id.*).

Plaintiff does not address the merits of these claims, but rather responds to Defendant's recoupment arguments by contending that "there is nothing in the Policy that would allow Commonwealth to pursue periphery claims against the Quattrocchis, Contacessa, Discount Funding, Boleslawski, and/or Kopald . . . *prior to making a payment to Emigrant*, or at a minimum, . . . accept[ing] . . . the [c]laim." (Pl.'s Opp'n 21 (emphasis added).) This argument is misplaced. At the time Plaintiff submitted the claim, Defendant denied it—presumably, at least in part—because it recognized that various avenues of recoupment would no longer be available due to Plaintiff's late notice. (*See* Def.'s Mem. 22 n.6 ("Emigrant no doubt will argue that Commonwealth should not criticize Emigrant's recoupment efforts, or lack thereof, after Commonwealth would not cover the claim. However, Commonwealth is simply referencing the myriad of ways in which Commonwealth could have sought recoupment had Emigrant made a timely claim.").)

That is not to say that the Court finds merit in each of Defendant's arguments regarding prejudice. For example, Defendant's generic claim that they were prejudiced by Emigrant's delay because of "witnesses' faded memories," (Def.'s Opp'n 17), is unavailing, *see, e.g.*, *Anonymous v. N.Y. State Dep't of Health*, 927 N.Y.S.2d 1, 1 (App. Div. 2011) ("Conclusory allegations that the passage of time has dulled witnesses' memories do not demonstrate actual prejudice."). However, the Court finds that, here, "the late notice prevented [D]efendant from taking . . . steps to mitigate its liability and protect its interests." *Chrysler First Fin. Servs. Corp.*

*of Am. v. Chicago Title Ins. Co.*, 641 N.Y.S.2d 13, 14 (App. Div. 1996). And while

"[Commonwealth] cannot be expected to show precisely what the outcome would have been had

timely notice been given," "[Emigrant] should not be permitted to use that uncertainty as a

weapon against [Commonwealth]." *Fairchild*, 56 F.3d. at 440–41; *see also Ins. Co. of the State*

*of Pa. v. Argonaut Ins. Co.*, No. 12-CV-6494, 2013 WL 4005109, at *11 (S.D.N.Y. Aug. 6,

2013) ("Although [the defendant] is unlikely to show that its participation in the litigation would

have altered the ultimate legal rulings in the [action], [the defendant] may establish that its

participation in the litigation would have resulted in not merely an earlier settlement but a more

advantageous one as well."). Accordingly, Plaintiff's Motion for Summary Judgment is denied.

### 3. Commonwealth's Motion for Summary Judgment

Commonwealth asserts that "Emigrant's failure to give timely notice was in violation of

the Policy and prejudicial to Commonwealth," and thus, "Emigrant's claim is barred." (Def.'s

Mem. 16, 18–19.)

In a letter response to Rifkin dated February 15, 2011, Neal D. McMahon,

Commonwealth's Vice President/Senior Claims Counsel "reiterates [Commonwealth's]

conclusion that the [c]laim [was] not afforded coverage under the terms of the Policy at [that]

time." (Feb. 15, 2011 Letter 1.) The letter further states:

> Please note that [Commonwealth] has not asserted that [Emigrant's] failure to
> timely submit the [c]laim has resulted [in] an "absolute bar" to its recovering any
> losses resulting from the existence and possible foreclosure of the IndyMac
> Mortgage. It has simply informed [Emigrant] that [Commonwealth] has no
> obligation at this juncture to contest the results of the Foreclosure Action because
> the entry of the foreclosure judgment has robbed it of its opportunity to do so.
> Nothing, however, prevents [Emigrant] from submitting a proof of loss to
> [Commonwealth] which describes exactly the damages [Emigrant] has suffered to
> date as a result of the IndyMac Mortgage pursuant to [§] 4 of the Policy.

(*See id.* 1–2.) Plaintiff did not submit a proof of claim or otherwise respond to this letter.

Emigrant contends that "[n]o proof of claim was submitted by Emigrant, as it would not make sense in light of Commonwealth's conclusion that there was no coverage." (Pl.'s Opp'n 9.) Emigrant further argues that it "was not specifically requested to provide [a proof of claim]" and "[t]o the extent that Commonwealth's February 15, 2011 letter can be construed as a request for proof of loss (although it was not), such a request would have been improper as it would impose obligations on Emigrant which are not clearly set forth in the Policy." (*See* Decl. of Zhanna Kandel in Opp'n to Def.'s Mot. for Summ. J. ¶ 59 (Dkt. No. 73).)

Section 4 of the Policy, entitled "Proof of Loss" provides

> In the event [Commonwealth] is unable to determine the amount of loss or damage, *[Commonwealth] may, at its option, require as a condition of payment that [Emigrant] furnish a signed proof of loss*. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this [P]olicy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

(Policy 10 (emphasis added).) The Court thus disagrees with Plaintiff that submission of a proof of loss was not clearly set forth in the Policy.

Commonwealth's February 15, 2011 letter stated that "[Emigrant's] January 24 Letter provided no such [proof of loss] calculation; it simply demanded immediate payment of the face amount of the Policy. This is not consistent with the conditions precedent to payment set forth in the Policy." (Feb. 15, 2011 Letter 2.) The Court agrees that as a result of Emigrant's failure to provide timely notice to Commonwealth, Emigrant was not entitled to the full value of the Policy. However, to the extent Commonwealth's denial of Emigrant's claim and the asserted basis for Commonwealth's Motion for Summary Judgment is the prejudice that it suffered as a result of Emigrant's untimely notice, the Court finds that there is a dispute of fact as to what amount Commonwealth's liability to Emigrant "under the [P]olicy shall be reduced," pursuant to the notice provision. (Policy 10.)

Commonwealth may well contend that it was prejudiced by the full amount of the Policy, just as Emigrant's ultimate proof of loss may show that the amount of loss or damage it suffered was the face value of the Policy. However, the Court cannot decide this issue on the basis of the record before it. Accordingly, Commonwealth's Motion for Summary Judgment is denied.

## III. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment and Defendant's Motion for Summary Judgment are denied.

The Court will hold a conference on October 30, 2017 at 2:30 P.M. to set a date for trial.

The Clerk of Court is respectfully requested to terminate the pending Motions. (*See* Dkt. Nos. 59, 66.)

SO ORDERED.

Dated:     September 26, 2017
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE